TAMBRY L. BRADFORD (State Bar No. 223282)
MATTHEW H. LADNER (State Bar No. 284594)
**PEPPER HAMILTON LLP**
350 South Grand Ave., Suite 3400
Los Angeles, California 90071
Telephone: 213.928.9800
Facsimile: 213.928.9850
Email: bradfordt@pepperlaw.com
        ladnerm@pepperlaw.com

Attorneys for Plaintiff
NIAGARA INTERNATIONAL CAPITAL LIMITED

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| NIAGARA INTERNATIONAL CAPITAL LIMITED, | Case No. |
|---|---|
| Plaintiff, | **COMPLAINT FOR BREACH OF CONTRACT** |
| v. | |
| SPORT CHALET, LLC f/k/a SPORT CHALET, INC. | |
| Defendant. | |

Plaintiff Niagara International Capital Limited ("Niagara") alleges against Defendant Sport Chalet, LLC f/k/a Sport Chalet, Inc. ("Sport Chalet") as follows:

## INTRODUCTION

1.      This is a breach of contract action stemming from a February 19, 2014 letter agreement (the "Agreement") between Niagara, Sport Chalet, and non-party Cappello Global, LLC ("Cappello"), and Sport Chalet's failure to honor its contractual obligations and fully compensate Niagara under the terms of the Agreement.  Specifically, after Niagara assisted Sport Chalet in closing two deals worth nearly $100 million combined, Sport Chalet refused to pay Niagara the full amount of fees owed to Niagara under the terms of the Agreement.  Niagara seeks damages of over $711,000, plus interest and attorneys' fees as provided under the Agreement.

## PARTIES

2.      Niagara is a New York corporation with a principal place of business in Clarence, New York.

3.      Sport Chalet is a Delaware corporation with a principal place of business in La Cañada, California and, on information and belief, is the successor in interest to Sport Chalet, Inc.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action under 28 U.S.C. § 1332(a).

5.      Venue is appropriate in the Central District of California because the majority of the events underlying the Complaint took place in this judicial district, and because Sport Chalet has substantial ties to, and conducts business in, this judicial district.

## FACTUAL ALLEGATIONS

6.      Niagara is a registered broker dealer and investment advisor with a branch office in Santa Monica, California.

COMPLAINT FOR BREACH OF CONTRACT

7.    Sport Chalet owns and operates a chain of specialty sporting goods stores throughout California, as well as Nevada, Utah, and Arizona.

8.    On February 19, 2014, Niagara, Cappello, and Sport Chalet – through a Special Committee of Sport Chalet's Board of Directors – entered into the Agreement. (*See* Ex. A.)

9.    Under the terms of the Agreement, Niagara and Cappello agreed to serve as the "exclusive financial advisors to [Sport Chalet's] Special Committee of the Board of Directors," with Niagara performing "[a]ll services … that require registration as a broker or dealer . . . ." (*Id*. at 1.)  The parties agreed that such services could be performed in connection with six types of transactions, including, but not limited to, "a private placement," "the sale of [Sport Chalet]," and "a recapitalization." (*Id*. at 1-2.)

10.    The Agreement sets forth a detailed fee schedule, listing the fees and expense reimbursements Sport Chalet agreed to pay to Niagara for its services upon the happening of certain events and/or the closing of certain transactions. (*Id*. at 4-7, defining "Transaction Fees.")  The Agreement provides that all services that require registration as a broker or dealer shall be performed by Niagara, and that all Transaction Fees due under the Agreement shall be paid only to Niagara as the registered broker dealer. (*Id*. at 1, 4). [1]

11.    In accordance with the fee schedule, Sport Chalet agreed, "[a]t Closing of a Private Placement," to "pay to Niagara a cash fee equal to the percentage of the Placement Amount. . . according to the attached  Schedule B for mezzanine capital (including non-convertible senior debt with an equity component or subordinated debt with or without an equity component) . . . ." (*Id*. at 5.)

---

[1] Cappello is a marketing entity that does not hold a FINRA license or receive broker-dealer fees.  Cappello does, however, perform non-broker, financial consulting services.

COMPLAINT FOR BREACH OF CONTRACT

12.     Sport Chalet agreed to pay Niagara a fee of 4.25 percent of any "sale of mezzanine capital (includ[ing] … subordinated debt with or without an equity component)" up to and including $25 million.  (*Id*. at 12, Schedule B.)

13.     Sport Chalet also agreed, at the closing of a "Sale or Merger," to pay Niagara a cash fee equal to a percentage of the total transaction value, as calculated in accordance with the Agreement's "Schedule D."  (*Id*. at 5.)

14.     Pursuant to the terms of the Agreement, Niagara assisted Sport Chalet in: i) securing a $15 million loan from Crystal Financial SBIC LP (the "Crystal Loan"); and ii) locating a buyer for Sport Chalet, and concluding a sale of Sport Chalet to Vestis Retail Group (the "Vestis Sale").

15.     The transaction documents for the Crystal Loan characterized the transaction as subordinated debt.  These documents included the Term Loan and Security Agreement and the Intercreditor Agreement.   Sport Chalet also characterized the Crystal Loan as subordinated debt in filings with the Securities and Exchange Commission.

16.     The Crystal Loan closed on June 27, 2014.  On that date, under the terms of the Agreement, Sport Chalet owed Niagara a fee of $500,000 ($637,500 less credits of $137,500).

17.     The Vestis Sale closed on August 15, 2014.  On that date, under the terms of the Agreement, Sport Chalet owed Niagara a separate and additional fee of $2,174,070 ($2,324,070 less a credit of $150,000).

18.     On September 16, 2014, Sport Chalet paid $1,963,057 on account of the fees it owed to Niagara under the Agreement.

19.     Sport Chalet asserts that this $1,963,057 represents the entire amount of fees and expenses it owes to Niagara for both the Crystal Loan and the Vestis Sale.

COMPLAINT FOR BREACH OF CONTRACT

## FIRST CAUSE OF ACTION – BREACH OF CONTRACT

### (Against Sport Chalet)

20.     Niagara realleges and incorporates by reference paragraphs 1 through 19 as though fully stated herein.

21.     Niagara and Sport Chalet entered into a valid contract by executing the Agreement on February 19, 2014.

22.     Niagara fully performed its obligations under the Agreement.

23.     Under the terms of the Agreement, Sport Chalet owes Niagara fees for the Crystal Loan and the Vestis Sale.

24.     Sport Chalet has not paid Niagara those fees in their entirety, and has therefore breached the Agreement.

25.     As a result of Sport Chalet's breach, Niagara has suffered damages in the amount of $711,013, plus interest and attorneys' fees as provided under the terms of the Agreement.

**WHEREFORE**, Plaintiff prays for judgment as follows:

1.     For $711,013;

2.     For pre-judgment interest at the rate of one percent per month beginning in July 2014 as set forth in the Agreement;

3.     For reasonable attorneys' fees – as provided under the terms of the Agreement –  dating to July 2014 based on Sport Chalet's unjustified and baseless refusal to pay fees due to Niagara under the Agreement;

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

COMPLAINT FOR BREACH OF CONTRACT

1    4.    For the costs of suit; and

2    5.    For such other and further relief as the Court deems just and proper.

3

4    Dated: January 8, 2015                    PEPPER HAMILTON LLP

5

6                                             By: /s/ Tambry L. Bradford

7                                                 TAMBRY L. BRADFORD
                                                 Attorneys for Plaintiff
8                                                 NIAGARA INTERNATIONAL
                                                 CAPITAL LIMITED
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR BREACH OF CONTRACT

# EXHIBIT A

 

CAPPELLO GLOBAL, LLC

NIAGARA INTERNATIONAL CAPITAL LIMITED

**CONFIDENTIAL**

February 19, 2014

Special Committee of the Board of Directors
Sport Chalet, Inc.
One Sport Chalet Drive
La Cañada, CA 91011
Attention: Kevin Ventrudo, Chair

Dear Mr. Ventrudo:

This letter agreement ("Agreement") confirms the engagement of Cappello Global, LLC ("Global") and Niagara International Capital Limited through which all securities are offered ("Niagara," and together with Global, collectively, "Advisor") as exclusive financial advisors to the Special Committee of the Board of Directors (the "Committee") to perform the financial advisor services provided for herein. The term "Company" as used herein shall include Sport Chalet, Inc., its subsidiaries and affiliated entities.

**Transaction:**

All services described herein that require registration as a broker or dealer shall be performed by Niagara. Advisor may perform financial advisor services relating to the following types of transactions (each a "Transaction"):

a) a private placement, conducted pursuant to Regulation D of the U.S. Securities Act of 1933 or other applicable U.S. or foreign securities laws, rules and regulations with a Covered Party (a "Private Placement") including, without limitation, a placement of equity, debt, convertible securities or other financial instrument in such amount as the Company and the Advisor may agree upon ("Placement Amount"). The gross amount of capital raised in the Private Placement is referred to herein as the "Placement Amount". Our services regarding a Private Placement do not constitute a firm underwriting or guaranty of raising any specific amount of capital;

b) the sale of the Company (a "Sale" or "Merger") to a Covered Party, whether by merger, reverse merger, sale in one or more transactions of all or substantially all of the assets of the Company, or sale in one or more transactions of capital stock, that results in the stockholders of the Company owning less than a majority of the surviving entity or, in the case of a merger or sale with or to a shell company or a special purpose acquisition corporation (SPAC), irrespective of the resulting percentage of ownership;

c) the sale of a portion of the Company (a "Divestiture"), whether by sale of capital stock or sale of any portion of the assets of the Company to a Covered Party, excluding the sale of inventory in the ordinary course of business;

d) a recapitalization (a "Recapitalization") involving the issuance of any indebtedness or equity securities by the Company to a Covered Party which may or may not involve, among other terms, an extraordinary dividend being paid or equity securities being repurchased by the Company, whether as a stand-alone Transaction or in connection with a related Transaction;

**Sport Chalet, Inc.**
Engagement Agreement – February 19, 2014 – Page 2

| **CONFIDENTIAL** |
| --- |

e) a strategic alliance (a "Strategic Alliance") that involves an agreement with a Covered Party that may, directly or indirectly, involve sales, marketing and/or management of or by the Company and that is not entered into in the ordinary course of the Company's business conducted as of the date of execution of this Agreement, it being understood that the sales and marketing agreements entered into by the Company with the third parties listed on **Appendix C** (which may be updated from time to time by the Company with the consent of Advisor, such consent not to be unreasonably withheld or delayed) or similar such agreements or arrangements with those parties, and those third parties also listed on **Appendix C** with whom the Company is engaged in, or plans to engage in, discussions about sales and marketing opportunities, shall be deemed strategic alliances in the ordinary course of the Company's business;

f) a strategic acquisition (an "Acquisition") pursuant to which (i) the Company consummates a merger, consolidation or other business combination with a Covered Party, where the Company is the surviving entity (or its shareholders own a majority of the equity in the surviving entity) of such merger, consolidation or other business combination, or (ii) the Company acquires equity of a Covered Party, or any assets of a Covered Party.  Notwithstanding the foregoing, Acquisition shall not include reverse mergers or Transactions with a SPAC; and

g) any Transaction that qualifies as more than one of the Transactions described in clauses (a) through (f) shall constitute the Transaction that results in the higher Transaction Fee for Advisor. The parties understand and agree that any transaction entered into by the Company and any Covered Party that is not specifically described in clauses (a) through (f) shall constitute the Transaction that more closely describes the result for the Company.

**Description of Services:**

Advisor will, to the extent requested by the Committee, assist the Committee, and, if requested by the Committee, the Board of Directors and the Company in analyzing potential Transactions according to the terms and conditions of this Agreement.  In this regard, the Advisor may undertake certain activities on behalf of the Committee, including the following:

a) analyzing and advising with respect to Transaction options available to the Company;

b) counseling the Committee, and, if requested by the Committee, the Board of Directors, as to strategy and tactics for effecting a potential Transaction;

c) advising the Committee, and, if requested by the Committee, the Board of Directors, as to the structure and form of a possible Transaction, including the form of any agreements related thereto;

d) assisting the Company in obtaining appropriate information and in preparing due diligence presentations related to a potential Transaction;

e) subject to the prior written approval (including email) of the Committee, or its respective designees prior to Advisor disclosing any Confidential Information to, and contacting, institutional investors, accredited individual investors, strategic or financial buyers, distributors, licensees, and/or strategic partners, and meeting with and providing introductions to the Company;

f) assisting in negotiations related to a potential Transaction, as may be appropriate, on behalf of the Committee;

**Sport Chalet, Inc.**
Engagement Agreement – February 19, 2014 – Page 3

CONFIDENTIAL

g) coordinating with the Committee's and the Company's legal counsel regarding matters related to the closing of a Transaction; and

h) rendering such other financial advisory and investment banking services as may from time to time be agreed upon by the Committee, on behalf of the Company, and Advisor.

i) Advisor and the Committee understand that the specific services from the list above will have to be mutually agreed upon with Advisor and are dependent upon the type of Transaction or Transactions that the Committee ultimately determines to pursue. Any proposal for a Transaction is subject to documentation satisfactory to the Committee. Advisor's engagement is with the Committee only and, except as otherwise set forth herein, no other party is intended as a third party beneficiary of this Agreement. Any communications by or on behalf of Advisor with stockholders, directors, or officers of the Company is intended solely within their respective capacities as directors or officers of the Company, or affiliates of directors or officers, and is not intended in their capacity as stockholders, or other non-management related capacities.

If you request, we will arrange for our corporate finance affiliate Cappello Group, Inc. ("CGI") to undertake an investigation and analysis to enable CGI to render an opinion (the "Opinion") to the Committee addressing the fairness, from a financial point of view, of the consideration the Company and/or its stockholders will receive in a proposed Transaction. The fee for an Opinion shall be negotiated with and payable to CGI and shall be subject to mutual approval by CGI and the Committee, in their sole discretion. The nature and scope of CGI's investigation and analysis, as well as the scope, form and substance of any such Opinion, shall be such as CGI deems appropriate. It is expected that the Opinion would be addressed to and prepared solely for the use of the Committee, and, at the Committee's discretion, the Company's Board of Directors, and will provide that it may not be relied upon by any other person. Please note that neither Advisor nor CGI provides any legal, tax or accounting advice. The Company may include the full text of the Opinion in any proxy/information statement, registration statement or similar communication filed by the Company in connection with the Transaction and a description thereof, including a fair and accurate summary of the analysis underlying the Opinion, and the Company may provide disclosure with respect to Advisor and CGI, the engagement of Advisor and CGI by the Committee, the terms of this Agreement and the services provided by Advisor and CGI hereunder, subject in each case to the prior approval of Advisor, which approval shall not be unreasonably withheld, conditioned or delayed.

**Exclusivity:**

The Company agrees that no other financial advisor is or will be authorized by it during the Term of this Agreement to perform services on the Company's behalf of the type described hereunder or which Advisor is otherwise authorized by the Company to perform hereunder. No fee payable to any other financial, legal, or other advisor either by the Company or any other entity shall reduce or otherwise affect the fees payable hereunder to Advisor, except as otherwise agreed to in writing by Advisor. In order to coordinate Advisor's efforts with respect to a possible Transaction, during the period of Advisor's engagement hereunder neither the Company nor any representative thereof (other than Advisor) will engage in discussions regarding a Transaction except through, or as coordinated with, Advisor. If the Company or its management receives an inquiry regarding a Transaction, it will promptly inform Advisor in writing of such inquiry.

**Sport Chalet, Inc.**
Engagement Agreement – February 19, 2014 – Page 4

<div style="border:1px solid">CONFIDENTIAL</div>

**Information Furnished by the Company:**

The Committee will cause the Company to furnish Advisor with all financial and other information and data as Advisor believes appropriate in connection with its activities on the Committee's behalf, and shall provide Advisor full access to its officers, directors, and professional advisors, and reasonable access to certain of its employees upon prior written consent of the Committee or its designees. The Company acknowledges that it and its counsel will be solely responsible for ensuring that the Transaction complies in all respects with applicable law. The Company represents and warrants that any written or oral communication with Advisor at all times through Closing, will not contain any untrue statement of material fact or omit to state any material fact required to be stated therein or necessary to make the statements contained therein, in light of the circumstances under which they were made, not misleading. The Company will promptly notify Advisor if it learns of any material inaccuracy or misstatement in, or material omission from, any information theretofore delivered to Advisor. The Company recognizes and confirms that Advisor, in connection with performing its services hereunder, (i) will be relying without investigation upon all information that is available from public sources or supplied to it by or on behalf of the Company or its advisors, (ii) will not in any respect be responsible for the accuracy or completeness of, or have any obligation to verify, the same and (iii) will not conduct any appraisal of any assets of the Company. The Company will also cause to be furnished to Advisor at the Closing copies of such agreements, opinions, certificates and other documents delivered at the Closing as Advisor may reasonably request.

Advisor acknowledges that, in connection with the services to be provided pursuant to this Agreement, certain confidential, non-public and proprietary information concerning the Company and the Transaction (the "Confidential Information") has been or may be disclosed by the Company, and its employees, consultants, affiliates, attorneys, accountants and advisors (collectively, the "Representatives") to Advisor or its Representatives. Advisor agrees that, without the Company's prior written consent of the Committee or its designees, no Confidential Information will be used other than for the purpose of providing services hereunder or disclosed, in whole or in part, to any other person. The term "Confidential Information" does not include any information: (a) that was already in the possession of Advisor or any of its Representatives; (b) is obtained by Advisor or any of its Representatives from a third person which, insofar as is known to Advisor and its Representatives, is not subject to any prohibition against disclosure; (c) which was or is independently developed by Advisor or any of its Representatives without violating any confidentiality obligations under this paragraph, as demonstrated by written record; (d) which was or becomes generally available to the public through no fault of Advisor or its Representatives; or (e) which was or is required to be disclosed pursuant to court order or by FINRA or any governmental or quasi-governmental agency. The obligations of Advisor and its Representatives regarding Confidential Information as set forth in this paragraph shall remain in effect for a period of two (2) years after the date of this Agreement.

**Fees and Expenses:**

In connection with the services rendered by Advisor under this Agreement, the Company agrees to pay to Niagara the following fees (such fees, sometimes referred to herein as the "Transaction Fee") and expense reimbursement. Transaction Fees, as determined below, will be reduced by $100,000 against aggregate fees in excess of $500,000 due per paragraphs (b), (c), (d), (e), (f), (g) or (h) of the Fees and Expenses section of this Agreement:

CONFIDENTIAL

a) Upon the signing by the Company of a letter of intent, term sheet, memorandum of understanding or similar such agreement (each a "Letter of Intent") regarding a Transaction with a Covered Party, the Company agrees to pay to Niagara $150,000 ("Milestone Fee"), payable on the date of such signing in either of the two following methods as determined by the Company: (i) $150,000 in cash or (ii) $100,000 in cash and $50,000 in shares of restricted common stock of the Company, priced at the volume weighted average price of the Company's common stock on the business day immediately prior to the date of such Letter of Intent. The Milestone Fee shall be credited against aggregate fees in excess of $500,000 due per paragraphs (b), (c), (d), (e), (f), (g) or (h) of the Fees and Expenses section of this Agreement.

b) At Closing of a Private Placement, the Company shall pay to Niagara a cash fee equal to a percentage of the Placement Amount (i) according to the attached **Schedule A** for equity (or securities convertible, exchangeable or redeemable into equity), (ii) according to the attached **Schedule B** for mezzanine capital (including non-convertible senior debt with an equity component or subordinated debt with or without an equity component), or (iii) according to the attached **Schedule C** for senior debt with no equity component. Notwithstanding subclause (iii) in the immediately preceding sentence, the cash fee payable to Niagara with respect to senior debt issued to or restructured with any of the lenders listed on **Appendix B** in a senior debt refinance transaction of $50 million or less and in the ordinary course of the Company's business shall be 0.25% of the Private Placement amount, it being understood that the fees due to Niagara on any senior debt in a Private Placement shall be determined solely in accordance with **Schedule C** for either (i) the amount greater than $50 million placed with any of the lenders listed on **Appendix B** or (ii) any lender not listed on **Appendix B** for any amount of senior debt.

c) At Closing of a Strategic Alliance or a Divestiture, the Company shall pay to Niagara a cash fee equal to a percentage of the Transaction Value, according to the attached **Schedule B**, it being understood that a Private Placement may occur as part of a Strategic Alliance, in which case the Transaction Fee shall be computed, without duplication, at the higher of the two fees in accordance with **Schedule A** or **Schedule B**, as applicable to such Private Placement or Strategic Alliance.

d) At Closing of a Sale or Merger, the Company shall pay to Niagara a cash fee equal to a percentage of the Transaction Value, according to the attached **Schedule D**, it being understood that a Private Placement may occur as part of a Sale or Merger, in which case the Transaction Fee shall be computed, without duplication, at the higher of the two fees in accordance with **Schedule A** or **Schedule B**, as applicable to such Private Placement, or Sale or Merger.

e) At the Closing of a Recapitalization either as a separate Transaction or in conjunction with another Transaction where financing is obtained in such Transaction, the Company shall pay to Niagara a cash fee equal to a percentage of the Transaction Value, (i) according to the attached **Schedule A** for equity (or securities convertible or exchangeable into equity or redeemable), (ii) according to the attached **Schedule B** for mezzanine capital (including non-convertible senior debt with an equity component or subordinated debt with or without an equity component), and (iii) according to the attached **Schedule C** for senior debt with no equity component.

f) At the Closing of an Acquisition, the Company shall pay to Niagara, a cash fee equal to a percentage of the Transaction Value, according to the attached **Schedule B**, it being understood that a Private Placement or other Transaction may occur as part of an Acquisition, in which case the Transaction Fee shall be computed, without duplication, at the higher of the two fees in

**Sport Chalet, Inc.**
Engagement Agreement – February 19, 2014 – Page 6

CONFIDENTIAL

accordance with **Schedule A, Schedule B**, or **Schedule C** as applicable to such Private Placement or Acquisition.

g) Any Transaction Fee described herein, may be paid in lieu of cash upon the mutual consent of Advisor and the Company, in whole or in part, in the form of consideration equivalent to that employed in the Transaction. Any securities payable to the Niagara under this Agreement shall entitle the holder to customary piggyback registration rights.

h) The Committee, on behalf of the Company, agrees to reimburse any out of pocket expenses incurred by the Advisor during the Term of the Agreement, whether or not a Transaction is consummated, including, but not limited to, legal, consulting, travel, lodging and due diligence expenses. Before incurring aggregate expenses in excess of $10,000, Advisor must obtain prior written consent of the Committee (for which consent an email confirmation from the Committee or its designees shall be deemed sufficient). The Company shall promptly, but no later than five (5) business days upon receipt of an invoice (with customary support documentation), reimburse the Advisor for all expenses in excess of $10,000 related to arranging a Transaction, or other expenses incurred by Advisor in providing services to the Committee, including, but not limited to, legal, consulting, travel, lodging and due diligence expenses, approved by the Committee pursuant to this paragraph.

i) In the event that Niagara's fees, expenses, costs or other compensation, including warrants or other equity securities, are not paid or issued (as applicable) within 30 days from the date due, or the date of Advisor's invoice, if any, there will be an additional charge at a monthly rate of one percent (1%), or such lesser rate mandated by California law, upon the unpaid cash balance or the fair market value of such securities, as applicable, determined as of the date such securities were to be issued to Niagara in accordance with this Agreement.

j) If, during the Term of this Agreement, the Company decides not to proceed with a Transaction with a Covered Party, and instead, during the twelve (12) month period following the Termination of this Agreement ("Break-up Fee Period"), consummates with an investor or entity that is not a Covered Party any Transaction, or series of Transactions on substantially similar terms or that results in substantially similar economic and dilutive effects to those proposed by Advisor or such Covered Party, the Company at the Closing of each such Transaction immediately shall pay to Niagara a fee equal to fifty percent (50%) of the aggregate cash and non-cash fees provided for in the "Fees and Expenses" section and the "Additional Investment Option" section of this Agreement. A Transaction shall be deemed consummated during the Break-up Fee Period if any agreement in principle which includes material terms of such Transaction is reached prior to the expiration of the Break-up Fee Period even if the closing of such Transaction occurs after the expiration of the Break-up Fee Period, it being understood that at the Closing of each such Transaction the Company shall pay the foregoing fee to Niagara.

k) With respect to any Transaction involving an Acquisition of a Covered Party ("Target"), if in connection with the termination or abandonment of a proposed Transaction during the Term or within twelve (12) months after the Termination, the Company receives any so-called "termination," "break-up," "topping" or similar fee (including any characterized as expense reimbursement and any judgment for damages or amount in settlement of any dispute as a result of any termination or other failure to consummate the Transaction) or any profit arising from any shares (or option to acquire shares or assets) of Target or any of its affiliates to be acquired in connection with such Transaction, the Company shall pay to Niagara a termination fee (the "Termination Fee") equal to the greater of (x) $300,000 and (y) one-third (1/3) of the amount of

all such fees and profits, which Termination Fee shall be payable in cash promptly upon receipt of any such fees or profits by the Company; provided, however, that in no event shall the Termination Fee exceed the amount of all such fees and profits realized or realizable by the Company.

l)   Notwithstanding the foregoing, if any transaction of any kind that does not constitute a Private Placement, Strategic Alliance, Sale, Merger, Divestiture, Recapitalization, or Acquisition described above shall be Closed during the Term or the Fee Period between the Company and a Covered Party, then Niagara shall be entitled to be paid by the Company a cash fee based on the description of the Transaction above that most closely resembles the actual transaction when considered from the benefit realized or to be realized by the Company.

**Term, Termination and Fee Period:**

The term of this Agreement shall run from the date of receipt by Advisor of the Committee and the Company's signed acceptance of this Agreement, until 30 days thereafter, and will then automatically extend on a month-to-month basis thereafter until cancelled by either party pursuant to the terms hereof ("Term"). Except as otherwise provided for herein, this Agreement may be cancelled by either party upon thirty (30) days' prior written notice to the other party. Termination shall be deemed effective on the earlier of thirty (30) days following that date of such written notice or as mutually agreed upon by Committee and Advisor ("Termination"). Notwithstanding the foregoing, if any Covered Party (or any of their respective affiliates) consummates a Transaction with the Company at any time within eighteen (18) months of the Termination or expiration of the Term, as extended, if extended (the "Fee Period"), the Company agrees to promptly pay to Niagara at the Closing of each such Transaction the fees as determined according to the "Fees and Expenses" section of this Agreement and issue to Niagara the Additional Investment Option according to the "Additional Investment Option" section of this Agreement.   A Transaction shall be deemed consummated during the Fee Period if any agreement in principle which includes material terms of such Transaction is reached prior to the expiration of the Fee Period even if the closing of such Transaction occurs after the expiration of the Fee Period, it being understood that at the Closing of such Transaction the Company shall pay the foregoing fee to Niagara. Within thirty (30) business days following the Termination or expiration of the Term, Advisor shall deliver to the Company a list of Covered Parties for purposes of this Agreement. All provisions of this Agreement shall survive Termination and expiration of the Term, except for the obligations of Advisor to provide services to the Committee and any other party to this Agreement. Notwithstanding the foregoing, if no Transaction shall have been consummated during the Term or Fee Period, and if during the Fee Period the Company consummates a senior debt refinance transaction with any lender listed on **Appendix B** that is not in connection with or related to a Transaction that shall be consummated during the Fee Period, no fees shall be payable to Advisor with respect to such Private Placement of senior debt.

**Strategic Advisor Warrants:**

Immediately prior to the Closing of the initial Transaction, the Company will issue to Niagara or its designees, as partial compensation for the services rendered hereunder, warrants ("Warrants") to purchase 489,592 shares of voting Class A common stock with an exercise price of $2.24 per share of voting Class A common stock.  The term of the Warrants shall be 10 years and the other terms of the Warrants shall be customary for warrants issued by a public company to an investment banking firm.  The Warrants shall be deemed fully earned and vested upon the

Sport Chalet, Inc.
Engagement Agreement – February 19, 2014 – Page 8

CONFIDENTIAL

Closing of such Transaction. If either the Committee or Advisor elects to terminate this Agreement in accordance with the terms of this Agreement, the Warrants, if earned, may not be cancelled except in accordance with the express written terms thereof. The holders of the Warrants will be entitled to customary piggyback registration rights, for the shares of Company voting common stock underlying the Warrants. As of the date of this Agreement, the Company has 12,414,490 shares of Class A Common Stock outstanding, options to purchase 2,150,506 shares of Class A Common Stock outstanding, 1,775,821 shares of Class B Common Stock outstanding and options to purchase 33,501 shares of Class B Common Stock outstanding. There are no other options, warrants, rights, or other instruments outstanding that are convertible or exercisable into Class A Common Stock or Class B Common Stock.

All warrants shall contain cashless exercise provisions.

**Additional Investment Option:**

In addition to the Warrants, upon the Closing of each Transaction (and each subsequent Closing, if more than one) during the Term with a Covered Party that involves a Private Placement, in lieu of an over-allotment option, Niagara or its designees shall have the right to purchase from the Company for $100.00 an option to purchase 9.99% of the aggregate securities that are placed in the Transaction or a warrant to acquire 9.99% of the aggregate amount of shares of Company capital stock into which all of the securities sold at the Private Placement Closing (and each subsequent Closing, if more than one) are convertible, at a price equal to the price per share of the same securities (or the underlying securities into which the securities sold in such Transaction may be converted) as paid by the investor(s) at the applicable Closing (such options and/or warrants, collectively, the "Additional Investment Option"). However, if the aggregate securities that are placed in the Transaction are issued in the form of, or are convertible, exchangeable or redeemable into the Company's publicly listed equity, the Additional Investment Option will be priced at $2.24 per share of voting Class A common stock. The term of the Additional Investment Option shall be 10 years. The fees payable from the Company to Niagara in connection with such Transaction shall be automatically reduced by the Company to reflect a credit of $100.00, which credit shall represent Niagara's payment in full for the purchase of the Additional Investment Option. Failure by the Company to adjust fees payable to Niagara for such credit will not affect Niagara's right to the Additional Investment Option. The Additional Investment Option shall be fully earned and vested upon the date of Closing of the Private Placement, and each subsequent Closing, if more than one in connection with such Private Placement. All Additional Investment Option shall contain cashless exercise provisions. The holders of the Additional Investment Option shall be entitled to full, unconditional piggyback registration rights without any holdback obligations, for Company common stock underlying any Additional Investment Option. Below is an example, by illustration, of an exercise of an Additional Investment Option:

| | |
|---|---|
| Placement Amount: | $10,000,000 |
| Additional Investment Option | |
| (10% of Placement Amount, plus $100): | 1,000,100 |
| Total Funds Raised | $11,000,100 |

No fees will be payable to Niagara in connection with the exercise of the Warrants or the Additional Investment Options. The Committee and the Company understand and acknowledges

Sport Chalet, Inc.
Engagement Agreement – February 19, 2014 – Page 9

CONFIDENTIAL

that the issuance of the Warrants and the Additional Investment Options is a material inducement to Advisor to enter into this Agreement.

**Waiver of Conflicts:**

The Committee acknowledges that Advisor and its affiliates have and will continue to have investment banking and other relationships with parties other than the Company pursuant to which Advisor may acquire information of interest to the Committee. Advisor shall have no obligation to disclose such information to the Committee, or to use such information in connection with any contemplated transaction. The Committee recognizes that Advisor is being engaged hereunder to provide the services described above only to the Committee and to all other parties, if any, who execute this Agreement in specified other capacities and is not acting as an agent or a fiduciary of, and shall have no duties or liability to, the equity holders of the Company or any third party in connection with its engagement hereunder, all of which are hereby expressly waived. Except as otherwise set forth herein, no one other than the Committee (and such other parties to this Agreement, if any, in their designated capacities) is authorized to rely upon the engagement of Advisor hereunder or any statements, advice, opinions or conduct by Advisor. Upon Termination or expiration of the Term, Advisor shall be automatically released as to providing future services of any type whatsoever to the Committee (and all other persons comprising the Company) or any other party to this Agreement or any Covered Party.

**Indemnification:**

Recognizing that Advisor in providing the services contemplated hereby will act as an independent contractor and will rely on information provided by the Company, the Company shall indemnify Advisor, including, without limitation, Niagara, and the other Indemnified Persons as more specifically set forth in **Appendix A** hereto.

**Customer Identification Program:**

The USA PATRIOT ACT ("Patriot Act") is designed to detect, deter and punish terrorists in the U.S. and abroad. Pursuant to the requirements imposed on Niagara by the Patriot Act, as well as various Department of Treasury and Department of Homeland Security rules, regulations or interpretations, as applied from time to time ("AML Requirements"), Niagara is subject to various obligations. In addition, as a FINRA member, additional requirements apply (including with regard to the AML Requirements as well as so-called Know your Customer rules and Suitability rules). Upon request of Niagara, Company agrees that it will provide Niagara (or cause Niagara to be provided with) various corporate authority, corporate and personal identification documents and/or other informational items during the Transaction process so as to help verify the identity of the Company and its controlling parties as well as certain other parties who may be involved in the Transaction. Niagara maintains a Business Continuity Plan, a written summary of which may be obtained upon request of Niagara at its executive offices.

This Agreement together with **Schedule A, Schedule B, Schedule C, Schedule D, Appendix A, Appendix B** and **Appendix C** each attached hereto and incorporated by reference herein, constitute the entire agreement of the parties hereto with respect to the subject matter hereof, supersede all other oral or written representations, understanding or agreements relating to such subject matter, including such with any affiliates or predecessor entities of Advisor and may not be amended or modified except by a written agreement signed by all parties hereto. The Committee and the Company acknowledge and agree that they have no prior understandings,

**Sport Chalet, Inc.**
Engagement Agreement – February 19, 2014 – Page 10

CONFIDENTIAL

legal or equitable claims, relationships or consequences, with or against Advisor with respect to the subject matter herein or otherwise.

Remainder of Page Intentionally Left Blank

Niagara International Capital limited, California Branch Office
100 Wilshire Boulevard, Suite 1200, Santa Monica, California 90401
Telephone 310.393.6632 Fax 310.393.4838
**FINRA-SIPC**

**Sport Chalet, Inc.**
Engagement Agreement – February 19, 2014 – Page 11

CONFIDENTIAL

If this Agreement meets with your approval, please sign a copy of this Agreement and return it to us by facsimile or electronic mail, and mail the signed original to the undersigned.

Thank you for the opportunity to be of service.

Sincerely,

Gerard K. Cappello
Managing Director
Cappello Global, LLC

Anthony Nanula
President
Niagara International Capital Limited

**AGREED AND ACCEPTED:**

The foregoing Agreement accurately sets forth our understanding and agreement with respect to the matters set forth herein and has been executed by our duly authorized representative:

**SPORT CHALET, INC.**

By: _____

Name: _Craig Levra_

Title: _Chairman / CEO_

Date: _2/24/2014_

**SPECIAL COMMITTEE OF THE BOARD OF DIRECTORS**

By: _____

Name:   Kevin J. Ventrudo

Title:   Chairman, Special Committee

Date:   February 21, 2014

**Sport Chalet, Inc.**
Engagement Agreement – February 19, 2014 – Page 12

CONFIDENTIAL

**SCHEDULE A** - Equity (or securities convertible, exchangeable or redeemable into equity).

| | For Amounts Raised (in millions) | Fees[1] |
|---|---|---|
| **Schedule A** | Up to and including $25.0 | 7.00% |
| | From $25.1 to $50.0 | 6.75% |
| | From $50.1 to $75.0 | 6.50% |
| | From $75.1 to $100.0 | 6.25% |
| | $100.1+ | 6.00% |

(1) As a percentage of Placement Amount raised for each Transaction.

Example: the fee for a Private Placement of $75.0 million would be calculated as follows: ($25.0 x 7.00%) + ($25.0 x 6.75%) + ($25.0 x 6.50%) = $1.750 + $1.688 + $1.625 = $5.063 million.

**SCHEDULE B** - A Strategic Alliance, Divestiture, Acquisition or sale of mezzanine capital (includes non-convertible senior debt with an equity component, subordinated debt with or without an equity component).

| | For Transaction Value (in millions) | Fees[1] |
|---|---|---|
| **Schedule B** | Up to and including $25.0 | 4.25% |
| | From $25.1 to $50.0 | 4.00% |
| | From $50.1 to $75.0 | 3.75% |
| | From $75.1 to $100.0 | 3.50% |
| | $100.1+ | 3.00% |

(1) As a percentage of the Placement Amount or Transaction Value for each Transaction.

Example: the fee for a Transaction valued at of $75.0 million would be calculated as follows: ($25.0 x 4.25%) + ($25.0 x 4.00%) + ($25.0 x 3.75%) = $1.063 + $1.000 + $0.938 = $3.000 million.

**Sport Chalet, Inc.**
Engagement Agreement – February 19, 2014 – Page 13

CONFIDENTIAL

**SCHEDULE C** - Senior debt with no equity component.

| | For Amounts Raised (in millions) | Fees[1] |
|---|---|---|
| Schedule C | Up to and including $25.0 | 2.00% |
| | From $25.1 to $50.0 | 1.75% |
| | From $50.1 to $75.0 | 1.50% |
| | From $75.1 to $100.0 | 1.25% |
| | $100.1+ | 1.00% |

(1) As a percentage of Placement Amount for each Transaction.

Example: the fee for a Private Placement of $75.0 million would be calculated as follows: ($25.0 x 2.00%) + ($25.0 x 1.75%) + ($25.0 x 1.50%) = $0.500 + $0.438 + $0.375 = $1.313 million.

**SCHEDULE D** - A Sale or Merger

| | For Transaction Value (in millions) | Fees[1] |
|---|---|---|
| Schedule D | On all senior debt (up to a maximum of $50.0) | 2.00% |
| | Up to and including $100.0 of Transaction Value less the actual amount of senior debt (up to a maximum of $50.0) | 4.00% |
| | Amount in excess of $100.0 of Transaction Value | 5.00% |

(1) As a percentage of Transaction Value for each Transaction.

Example: the fee for a Transaction valued at of $75.0 million that includes $50.0 million of senior debt would be calculated as follows: ($50.0 x 2.00%) + ($25.0 x 4.00%) = $1.000 + $1.000 = $2.000 million.

The fee for a Transaction valued at of $125.0 million that includes $50.0 million of senior debt would be calculated as follows: ($50.0 x 2.00%) + ($50.0 x 4.00%) + ($25.0 x 5.00%) = $1.000 + $2.000 + $1.250 = $4.250 million.

**Sport Chalet, Inc.**
Engagement Agreement – February 19, 2014 – Page 14

CONFIDENTIAL

## Appendix A

### Additional Business Terms

This **Appendix A** is referenced in the Agreement between the Committee and the Company, on the one hand, and Cappello Global, LLC and Niagara International Capital Limited, on the other hand, and is an integral part of the Agreement. Unless otherwise defined in **Appendix A**, all capitalized terms used herein shall have the same meaning as set forth in the Agreement.

1. Definitions. For purposes of the Agreement, the capitalized terms below shall have the following meanings:

a. "Transaction Value" shall mean the total proceeds and other consideration paid or received, or to be paid or received, by the Company or its stockholders, other equity holders or partners, employees or creditors in connection with a Transaction (which consideration shall be deemed to include amounts in escrow), including, without limitation and without duplication, the gross value of all cash and: (i) equity securities (including, but not limited to, common stock, preferred stock, warrants, options, stock appreciation rights, and equity interests, in each case whether or not vested), received from a third party in connection with a Transaction; (ii) straight or convertible debt instruments or other obligations, whether or not vested, received from a third party in connection with a Transaction; (iii) indebtedness for borrowed money, capitalized leases and unfunded pension and similar liabilities of the Company, its stockholders, partners or other equity holders, that are forgiven, assumed or repaid in connection with a Transaction or, in the event of a stock or other equity sale, or merger or similar recapitalization, such debt and liabilities of the Company which remain outstanding after a Transaction; (iv) in the event of an asset sale, working capital (meaning current assets less current liabilities), and if excluded from the working capital determination, the amount of any other debts and liabilities of any type that are forgiven, assumed or repaid in connection with a Transaction; (v) amounts paid to the Company, its stockholders, other equity holders, employees or directors in connection with a Transaction for non-competition agreements; (vi) cash and cash equivalents to be retained or businesses retained by the Company in the event of an asset sale, or distributed to the Company's stockholders, partners, or other equity holders in the event of a stock or other equity sale, merger or similar reorganization; (vii) amounts paid to the Company, its stockholders, other equity holders, key employees or directors in connection with a Transaction with respect to employment, consulting or leasing arrangements to the extent above market, and licensing fees, royalties and similar amounts; (viii) management retention payments and transaction expenses incurred by the Company in connection with a Transaction, which are paid or assumed by a third party, or, in the event of a stock or other equity sale, merger or similar reorganization, which are left outstanding after a Transaction, and (ix) amounts paid, at any time during the Term, Fee Period, or Break-up Fee Period, as extraordinary dividends or other distributions to the Company's stockholders, partners or other equity holders in contemplation of a Transaction (but excluding performance-based bonuses). In the event there is disagreement as to whether the Company is receiving payment for services at usual market rates or receiving consideration in a Transaction, the Company and Advisor will negotiate in good faith to agree on the correct treatment for such amounts. In the event of a Merger or Sale of more than fifty percent (50%) but less than 100% of the equity interests of the Company, the Transaction Value shall be calculated as if 100% of the ownership of the equity interests of the Company has been sold. The face amount of all escrowed funds, promissory notes, fixed future non-employment related payments or other non-contingent future payments, will be considered received by the Company

CONFIDENTIAL

at Closing and included in Transaction Value solely for purposes of calculating Advisor's Transaction Fee (and the Transaction Fee will be paid as if these were received by the Company at Closing). If the Company completes a Transaction that includes seller notes, fixed future non-employment related payments or other non-contingent future payments, earn-out provisions or other performance-based contingent consideration ("Deferred Consideration"), the Company and Advisor will negotiate in good faith to agree on the value of such Deferred Consideration for the purpose of calculating that portion of the Transaction Fee to be paid to Niagara at the Closing in consideration thereof; if they cannot so agree, the value of the Deferred Consideration shall be included in Transaction Value solely for the purpose of Niagara's fee calculation hereunder, but the portion of the Transaction Fee allocable to the Deferred Consideration will only be paid to Niagara, if at all, when the Company or its stockholders, partners, or other equity holders receive such Deferred Consideration payments, provided that, in either outcome, the Transaction Fee at Closing shall be no less than that Transaction Fee determined according to the applicable **Schedule A, Schedule B or Schedule C** attached hereto. Notwithstanding the foregoing, in the event of an Acquisition, the "Company," for purposes of this definition shall be deemed to be the entity that merges, consolidates, is purchased by or otherwise combines with or into Sport Chalet, Inc. or one or more of its affiliates, or that sells its assets or equity to Sport Chalet, Inc. or one or more of its affiliates.

For the purpose of calculating the Transaction Value, any securities will be valued at the time of the closing of the Transaction as follows: (i) if such securities are traded on a stock exchange or the National Market System, the securities will be valued at the average last sale or closing price for the fifteen trading days immediately prior to the closing of the Transaction; (ii) if such securities are traded primarily in over-the-counter transactions (OTC), the securities will be valued at the mean of the closing bid and asked quotations similarly averaged over a fifteen-trading day period immediately prior to the Closing of the Transaction; and (iii) if such securities have not been traded for the time period necessary to determine values under clauses (i) and (ii) above, as mutually agreed by the parties or, if such agreement cannot be reached, as determined by an experienced, mutually-acceptable neutral appraiser or valuation professional who is instructed to take into account lock-up periods, illiquidity and minority shareholder discounts (and whose determination shall be final and binding on the parties); and provided that, clause (iii) shall be applicable (meaning the parties shall mutually agree on the value of such locked-up securities or, if such agreement cannot be reached within a reasonable time after initiating such discussion, such mutually-acceptable appraiser or valuation professional will be engaged to determine such value) if the recipients of such received securities are not permitted to sell at least fifty percent (50%) of them on the relevant exchange or market within 120 days following the Closing. Any other non-cash consideration shall be valued at the fair market value thereof as of the day prior to the Closing of the Transaction, as such fair market value shall be mutually agreed by Advisor and the Company acting in good faith (or, if Advisor and the Company cannot agree, as determined by an independent third-party accounting or valuation firm mutually chosen by the parties, whose determination shall be final and binding on the parties).

b.   "Closing" or "Closing of a Transaction" means the date that is the earlier of the closing or consummation of the Transaction pursuant to the material legal documentation of such Transaction, or the transfer (if applicable) of funds to or from the Company in connection with such Transaction.

c.   "Covered Party" means, collectively and individually, any natural person, corporation, partnership, limited liability company or other entity who is introduced or identified by or on behalf of Advisor (with the Company's prior approval, which approval will not be unreasonably withheld, delayed or conditioned) or the Company regarding a Transaction, or who is in contact with or is contacted by Advisor (with the Company's prior approval, which approval will not be unreasonably withheld, delayed or conditioned) or the Company regarding a Transaction during the Term of the Agreement.

2.   Limitation on Damages and Indemnification.

a.   The Company shall indemnify, defend and hold harmless the Advisor and each of their respective directors, officers, agents, employees, affiliates and representatives (collectively the "Indemnified Persons" and individually an "Indemnified Person"), to the full extent lawful, from and against any losses, liabilities, claims or damages, including, without limitation, fees and expenses of legal counsel, related to or arising out of the Advisor's engagement hereunder or the Advisor's role in the Transactions contemplated hereby, including, without limitation, any losses, liabilities, claims or damages arising out of any statements or omissions made in connection with the Transactions contemplated hereby whether by the Company, its employees, agents, Advisor or otherwise; provided, however, that such indemnity shall not apply to claims which are determined by a final judgment of a court of competent jurisdiction to have resulted directly from the fraud, willful misconduct or gross negligence of an Indemnified Person.

b.   No Indemnified Person shall have any liability to the Company for or in connection with this Agreement or the services rendered by Advisor, or any one of them, except for any which are determined by a final judgment of a court of competent jurisdiction to have resulted directly from the fraud, willful misconduct or gross negligence of the Indemnified Person. Notwithstanding any other provisions hereunder, in no event shall the Indemnified Persons be liable to the Company for an amount greater, in the aggregate, than the cash fees actually received by Niagara hereunder (it being specifically acknowledged by Company that any fees or damages that might otherwise be payable by Advisor hereunder shall be limited to the cash fees actually received by Niagara hereunder). These indemnification provisions are not exclusive, and shall be in addition to any other rights that any Indemnified Person may have at common law or otherwise.

c.   The Company will not, without Advisor's prior written consent (not to be unreasonably withheld or delayed), settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any action, claim, suit, investigation or proceeding in respect of which indemnification may be sought hereunder (whether or not any Indemnified Person is a party thereto) unless such settlement, compromise, consent or termination includes a release of each Indemnified Person from any liabilities arising out of such action, claim, suit, investigation or proceeding. The Company will not permit any such settlement, compromise, consent or termination to include a statement as to, or an admission of, fault, culpability or a failure to act by or on behalf of an Indemnified Person, without such Indemnified Person's prior written consent. No Indemnified Person seeking indemnification, reimbursement or contribution under this Agreement will, without the Company's prior written consent, settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any action, claim, suit, investigation or proceeding referred to herein.

d.   If any action is brought against any Indemnified Person in respect to which indemnity may be sought against the Company pursuant to this Agreement, or if any Indemnified Person

Sport Chalet, Inc.
Engagement Agreement – February 19, 2014 – Page 17

**CONFIDENTIAL**

receives notice from any potential litigant of a claim which such person reasonably believes will result in the commencement of any action or proceeding, such Indemnified Person shall promptly notify the Company in writing. Failure to notify the Company of any such action or proceeding shall not, however, relieve the Company from any other obligation or liability which it may have to any Indemnified Person under this Agreement or otherwise, except to the extent that the Company demonstrates that defense of such action is materially prejudiced by this failure. In case any such action or proceeding shall be brought against any Indemnified Person, the Company shall (at its own expense) defend the Indemnified Person in such action or proceeding with counsel of the Company's choice, and shall be entitled (at its own expense) to compromise or settle the action or proceeding, at its expense. Counsel selected by the Company under these circumstances must be satisfactory to the Indemnified Person in the exercise of its reasonable judgment. Notwithstanding the Company's election to assume the defense of any action or proceeding, the Indemnified Person shall have the right to employ separate counsel and to participate in the defense of any action or proceeding, and the Company shall bear the reasonable fees, costs and expenses of this separate counsel, if (i) the use of counsel chosen by the Company to represent the Indemnified Person would, in the reasonable judgment of the Indemnified Person's counsel, create a conflict of interest; (ii) the defendants in, or targets of, any action or proceeding include both an Indemnified Person and the Company, and the Indemnified Person's counsel shall have reasonably concluded that a conflict of interest exists between such Indemnified Person and the Company because, among other matters, there may be legal defenses available to it or to other Indemnified Persons which are different from or additional to those available to the Company (in which case the Company shall not have the right to direct the defense of such action or proceeding on behalf of the Indemnified Person); (iii) the Company shall not have employed counsel satisfactory to such Indemnified Person in the exercise of the Indemnified Person's reasonable judgment to represent such Indemnified Person within a reasonable time after notice of the institution of such action or proceeding; or (iv) the Company shall authorize such Indemnified Person to employ separate counsel at the Company's expense. The Company shall pay, or at Advisor's election, advance all reasonable fees, costs and expenses of any separate counsel retained pursuant to this paragraph at least quarterly.

e.    In order to provide for just and equitable contribution, if a claim for indemnification is found unenforceable in a final, non-appealable judgment by a court of competent jurisdiction, even though the express provisions of this Agreement provide for indemnification in such case, the Company and Advisor shall contribute to the losses, claims, damages, judgments, liability, expenses or costs for which the Indemnified Person may be liable in accordance with the relative benefits received by, and the relative fault of each respective party in connection with the statements, acts or omissions which resulted in losses, claims, damages, judgments, liabilities, or costs. The Company agrees that under these circumstances, a pro rata allocation would be unfair. Under no circumstances, however, will Advisor be obliged to make any contribution to any expenses described in this paragraph which is greater than the amount of cash previously received by Niagara for its services to the Company. No person found liable for a fraudulent misrepresentation or omission shall, however, be entitled to contribution from any person who is not also found liable for such fraudulent misrepresentation of omission.

f.    In further consideration of the provisions contained in our Agreement, in the event that an Indemnified Person becomes involved in any capacity in any action, claim, suit, investigation or proceeding, actual or threatened, brought by or against any person, including stockholders of Company, in connection with or as a result of the engagement or any matter

CONFIDENTIAL

referred to in the engagement, the Company will reimburse such Indemnified Person for its reasonable and customary legal and other expenses (including, without limitation, the costs and expenses incurred in connection with investigating, preparing for and responding to third party subpoenas or enforcing the engagement) incurred in connection therewith as such expenses are incurred.  Niagara will repay the Company any such reimbursed amounts described in the immediately preceding sentence in the event that such Indemnified Person was later determined by a final judgment of a court of competent jurisdiction that is not being appealed to have not been entitled to indemnification due to the fraud, willful misconduct or gross negligence of such Indemnified Person.

g.     Prior to entering into any agreement or arrangement with respect to, or effecting, any merger, statutory exchange or other business combination or proposed sale or exchange, dividend or other distribution or liquidation of all or a significant portion of its assets in one or a series of transactions or any significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Company set forth herein, the Company will notify Advisor in writing thereof (if not previously so notified) and, if requested by Advisor, shall use commercially reasonable efforts in connection therewith to arrange alternative means of providing for the obligations of the Company set forth herein, including the assumption of such obligations by another party, insurance, surety bonds or the creation of an escrow, in each case in an amount and upon terms and conditions satisfactory to Advisor.  The Company shall use its commercially reasonable efforts to cause any Transaction agreements with acquirers or providers of capital or financing to include exculpation and indemnification provisions in favor of Advisor and the Indemnified Persons which are equivalent to those set forth in **Appendix A** and are binding on such persons.

h.     These indemnification provisions shall (i) remain operative and in full force and effect regardless of any Termination or completion of the engagement of the Advisor; (ii) inure to the benefit of any successors, assigns, heirs or personal representative of any Indemnified Person; and (iii) be in addition to any other rights that any Indemnified Person may have at common law or otherwise.

3.     OFAC Programs.  The Company represents, to the best of its knowledge, that none of (i) the Company, (ii) any person controlling or controlled by the Company, (iii) any person having a beneficial ownership interest in the Company, and (iv) any person for whom the Company acts as an agent or nominee is (x) a country, territory, individual or entity named on the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") list, (y) a person or entity prohibited under the programs administered by OFAC ("OFAC Programs"), or (z) a county, territory, individual or entity named on another international sanctions list.   The Company further represents that, to the best of its knowledge, none of the proceeds of the Transaction shall be derived from or used for any purpose prohibited under the OFAC Programs or other international sanctions programs.

4.     Attorneys' Fees Provision.  In the event of any dispute between the Company and the Advisor, the prevailing party shall be entitled to recover from the other all of the prevailing party's costs and reasonable attorneys' fees and costs, together with an award of interest at 10% per annum on all amounts awarded to the prevailing party, including, without limitation, transaction fees and securities, reasonable attorneys' fees and costs and other costs.

5.     Governing Law and Jurisdiction.  This Agreement is governed by and construed in accordance with the laws of the state of California, without regard to its choice of laws

**Sport Chalet, Inc.**
Engagement Agreement – February 19, 2014 – Page 19

CONFIDENTIAL

provisions. All lawsuits, hearings, arbitration proceedings or other proceedings arising from or related to this Agreement shall take place in Los Angeles County, State of California. The parties irrevocably waive any objections they may have based on improper venue or inconvenient forum in Los Angeles County, State of California.

6.    Miscellaneous:

a.    All payments and reimbursements of expenses payable hereunder shall be made in U.S. dollars in immediately available funds. All amounts to be paid to the Advisor hereunder shall be made without any withholding or deduction for any tax, levy, duty or any other charge. Advisor has the right to publish a tombstone and case study describing the Transaction upon Closing, at its own expense, which may include the reproduction of the Company's logo, a brief description of the Transaction(s) and a link to the Company's website, provided, however, terms and conditions of the Transaction(s) not disclosed by the Company, or with the Company's consent, to the public, shall not be disclosed by Advisor. If requested by Advisor, the Company agrees to include a mutually acceptable reference to Advisor in any press release or other public announcement made by the Company regarding any Transaction.

b.    The headings used herein are for ease of reference only, and shall not be used to construe the meaning of this Agreement. This Agreement may be executed in counterparts, including by electronic transmission, each of which shall be deemed an original and all of which together shall constitute one agreement, binding upon all parties hereto.

c.    It is understood and agreed that Advisor is an independent contractor of the Company, and neither party is, nor shall be considered to be, the other's agent, partner, or fiduciary.

Advisor is not being retained hereunder to advise the Company as to the underlying business decision to consummate any Transaction or with respect to any related financing, derivative or other transaction.

d.    Other than as set forth in the indemnification provisions of **Appendix A** hereto, nothing in this Agreement is intended to confer upon any other person (including stockholders, employees or creditors of the Company) any rights or remedies hereunder or related hereto.

e.    Neither Advisor, nor any Indemnified Person, shall have any liability (including without limitation, liability for any losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses or disbursements) in contract, tort or otherwise to the Company, or to any person claiming through the Company, in connection with the engagement of Advisor pursuant to this Agreement and the matters contemplated hereby, except where such liability is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from the fraud, willful misconduct or gross negligence of Advisor.

f.    Advisor shall have no responsibility for any act or omission by any of the Company's Representatives.

g.    If any term, provision, covenant or restriction in this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable or against public policy, the remainder of the terms, provisions and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

**Sport Chalet, Inc.**
Engagement Agreement – February 19, 2014 – Page 20

CONFIDENTIAL

7.   <u>Restricted Trading</u>.  Upon execution of this Agreement, Advisor shall inform its personnel that the Company's publicly traded stock has been placed on its restricted trading list.

**Sport Chalet, Inc.**
Engagement Agreement – February 19, 2014 – Page 21

CONFIDENTIAL

## 8.   AGREED AND ACCEPTED:

The Company agrees to and accepts all the terms, covenants and conditions of this **Appendix A**.

**SPORT CHALET, INC.**

By: _____

Name: _Craig Levra_____

Title: _Chairman/CEO_____

Date: _2/24/2014_____


## SPECIAL COMMITTEE OF THE BOARD OF DIRECTORS

By: _____

Name:  Kevin J Ventrudo

Title:   Chairman, Special Committee

Date:   February 21, 2014

**Sport Chalet, Inc.**
Engagement Agreement – February 19, 2014 – Page 22

CONFIDENTIAL

## Wire instructions

| | |
|---|---|
| Account Name: | Niagara International Capital Limited<br>c/o Gerard Cappello<br>100 Wilshire Blvd., Suite 1200<br>Santa Monica, CA  90401 |
| Account Number: | 201007697 |
| Bank Name: | Grandpoint Bank<br>355 S. Grand Ave., Suite 2400<br>Los Angeles, CA  90071 |
| ABA Number: | 122244566 |

## If paying by check

| | |
|---|---|
| Pay to the order of: | Niagara International Capital Limited |
| Send to: | Niagara International Capital Limited<br>c/o Gerard Cappello<br>100 Wilshire Blvd., Suite 1200<br>Santa Monica, CA  90401 |

**Sport Chalet, Inc.**
Engagement Agreement – February 19, 2014 – Page 23

CONFIDENTIAL

## Appendix B

1. Bank of America
2. Wells Fargo
3. Capital One Business Credit
4. GE Capital
5. Pathlight Capital
6. GB Merchant Partners
7. Crystal Financial

**Sport Chalet, Inc.**
Engagement Agreement – February 19, 2014 – Page 24

CONFIDENTIAL

## Appendix C

1.    24 Hour Fitness for purposes of selling merchandise on online or in their stores including joint marketing activities and the reimbursement for fixtures and online enhancements.

2.    Amazon, eBay and other online retailers for the purposes of selling Sport Chalet merchandise on their sites, for up to $250,000 of value in cash or in kind.

3.    Sport Chalet merchandise vendors for purposes of joint marketing which includes reimbursement by the vendor and may also include store fixtures and extended dating on merchandise purchases, for up to $500,000 of value in cash or in kind.

4.    US Bank and First National Bank of Omaha solely for the purpose of offering Sport Chalet customers a cobranded credit card.